UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ALVIN WILLIAMS,

                Plaintiff,

-vs-                                          Case No. 6:04-CV-1412-Orl-31JGG

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.

_____/

## REPORT & RECOMMENDATION

      Plaintiff Alvin Williams ["the Plaintiff"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for a period of disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision should be **REMANDED** due to Appeals Council error.

**I.**     **PROCEDURAL HISTORY**

      On October 31, 2000, Williams filed a claim for Supplemental Security Income ["SSI"] benefits, claiming disability as of October 22, 2001.  R. 51-54.  On December 1, 2003, the Honorable Chester G. Senf, Administrative Law Judge ["ALJ"], held a thirty-minute hearing on the Plaintiff's claim in Orlando, Florida.  R. 324, 338, and 12-20.  Robert L. Hicks, Jr., a non-Attorney, represented Williams at the hearing.  R. 12.  The ALJ heard testimony from Williams.

-1-

On February 17, 2004, the ALJ issued a decision that Williams was not disabled and not entitled to benefits.  R. 9.  Following a review of the medical and other record evidence, the ALJ found that Williams could not perform his past relevant work as a dishwasher.  R. 19, Finding 7.  The ALJ found that Williams nevertheless retained the Residual Functional Capacity ["RFC"] to perform the full range of the physical exertional requirements of light work.  R. 19, Finding 11.  Applying the Medical-Vocational Guidelines, the ALJ concluded that Williams was not disabled.  R. 20, Finding 12.

After considering additional medical records, the Appeals Council denied review.  R. 5.  On September 23, 2004, Juan C. Gautier, Esquire, counsel for the Plaintiff, timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at 1.  On March 16, 2005, the Plaintiff's counsel filed in this Court a memorandum of law in support of his appeal.  Docket No. 14.  On May 11, 2005, the Commissioner filed a memorandum in support of her decision that Williams was not disabled.  Docket No. 15.  The appeal is ripe for determination.[1]

## II.  THE PARTIES' POSITIONS

Williams assigns four errors to the Commissioner.  First, Williams claims that the Commissioner erred in not giving substantial weight to the testimony of his examining physicians.  Second, Williams claims that the Commissioner erred by not finding a severe mental impairment.

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court.  According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation.  Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

Third, Williams claims that the Commissioner erred in failing to carry her burden of showing,

through the testimony of a vocational expert, that Williams could perform alternative work in the

national economy.  Fourth, Williams claims that the Commissioner erred in not properly

evaluating his subjective complaints of pain.  The Commissioner responds that substantial

evidence supports the Commissioner's decision that Williams was not disabled.  Docket No. 15.

**III.    THE STANDARD OF REVIEW**

      **A.    AFFIRMANCE**

      The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v.*

*Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th

Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937

F.2d 580, 584 n.3 (11th Cir. 1991).

      Where the Commissioner's decision is supported by substantial evidence, the district court

will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if

the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards*

*v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th

Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence

favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v.*

*Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine

reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

###    B.    REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

###    C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences.

*Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision.  *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new

> evidence which is material and that there is good cause for the failure to incorporate
> such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).  To remand under sentence six, the claimant must establish:  1.) that there is

new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and 3.) there is good

cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 -

92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547,

1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v.*

*Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the

Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at

1095.  With a sentence-six remand, the parties must return to the district court after remand to file

modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending

remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

### D.   STANDARD OF REVIEW WHERE APPEALS COUNCIL CONSIDERS NEW EVIDENCE

After the ALJ's decision — but before the Appeals Council decision — Williams

submitted additional medical records covering from April 4, 2002 through April 16, 2004.  R. 269-

321.  If a claimant submits evidence that does not relate to the relevant period under consideration,

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six.  *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text.  In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction.  *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court.  *Id.*

"the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [his or her] right to file a new application." 20 C.F.R. § 404.976 (b)(1)(2005).  The Appeals Council did not return the additional evidence to Williams.  Rather, the Appeals Council properly made the evidence a part of the record, and also considered the evidence in denying review.  R. 5-6 and 8.  The district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405 (g).  Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review,  the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405 (g).  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence.  20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence.  *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's  review is similarly broad.  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues.  *Sims*, 120 S.Ct. at 2086.  When

-7-

the Appeals Council refuses to consider new evidence submitted to it and denies review, the

Appeals Council's decision denying review is subject to judicial review. 20 C.F.R. § § 404.970

(b); 416.1470 (b); *Sims*, 120 S.Ct. at 2086; *Keeton v. Department of Health and Human Services*,

21 F.3d 1064, 1066 (11th Cir. 1994). Furthermore, the Appeals Council commits reversible error

when it refuses to consider new evidence and then denies review. *Keeton*, 21 F.3d at 1066.

Similarly, it is *reversible error* for a district court to consider only the evidence presented to the

ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a

decision of the Appeals Council. *Keeton*, 21 F.3d at 1066.

The Appeals Council must consider and evaluate new evidence to determine whether there

is a basis for changing the ALJ's decision. *Sims*, 120 S.Ct. at 2086; *Falge v. Apfel*, 150 F.3d

1320, 1322 n. 4 (11th Cir. 1998). When the Appeals Council has denied review, the district court

looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision*

is supported by substantial evidence. *Falge*, 150 F.3d at 1323; *accord, Eads v. Secretary of Health

and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to

weigh evidence never presented to him). Nevertheless, there is an important difference between

*Falge* and this case — a difference stressed by the United States Court of Appeals for the

Eleventh Circuit. In *Falge*, the claimant did not appeal the Appeals Council's decision to deny

review. Instead he appealed only the *ALJ's decision* to deny benefits. 150 F.3d at 1324. In this

case, however, the claimant does expressly appeal and seek a reversal of the Appeals Council's

decision to deny review. Docket No. 1 at 1. The Eleventh Circuit directs the district courts to

consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of

-8-

review.  *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066; *accord, Higgenbotham v. Barnhart*,

___F.3d ____, 2005 WL 730577 (5th Cir. March 31, 2005).

Indeed, it makes sense that Congress has provided for judicial review of the

Commissioner's final decision —  the last step of review necessary to exhaust administrative

remedies.  When the Appeals Council refuses to consider new evidence submitted to it, the

Appeals Council's decision denying review is subject to judicial review for error.  *Sims*, 120 S.Ct.

at 2086;  *Keeton*, 21 F.3d at 1066.  Similarly, when the Appeals Council denies review of an ALJ's

decision after receiving, considering, and evaluating new and material evidence that clearly and

thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's

decision denying review also must be subject to judicial review for error.  *See Falge*, 150 F.3d at

1324;  *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970 (b) (Appeals Council shall evaluate the

entire record including the new and material evidence submitted if it relates to the relevant period,

and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary

to the weight of the evidence currently of record).  The Commissioner cannot avoid judicial review

of the Appeals Council's decision to deny review by considering but not acting on new evidence

that is highly probative of disability, or by considering but not acting on evidence that shows in

retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence

currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a

necessary step in exhausting administrative remedies.  The Appeals Council has considered

claimant's additional evidence in light of the issues raised in the request for review, has considered

the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written

final decision determining that the ALJ neither erred nor abused his discretion, and determining

that the ALJ's findings are supported by substantial evidence.  The Appeals Council's

determination is subject to judicial review.  The Commissioner cannot avoid judicial review of the

Appeals Council's final decision by passing a regulation defining the term "final decision of the

Commissioner of Social Security" in 42 U.S.C. § 405 (g) as the decision of the ALJ, and by calling

the Appeals Council's final decision a "denial of review."  *See Sims*, 120 S.Ct. at 2086;  *accord*

*Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals Council's denial of

review was a judicially reviewable final decision under 42 U.S.C. § 405 (g)).

IV.    **THE LAW**

The law defines disability as the inability to do any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. §§ 416 (i), 423 (d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe,

making the claimant unable to do his or her previous work, or any other substantial gainful activity

which exists in the national economy.  42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

A.    **DEVELOPING THE RECORD**

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436,

438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The

Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the

social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§

-10-

406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a

claimant has waived the right to retained counsel, and even if the claimant is represented by

counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's

obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d

931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).

This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and

explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well

as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§

404.1520,  416.920.  First, if a claimant is working at a substantial gainful activity, he or she is not

disabled.  20 C.F.R. § 404.1520 (b).  Second, if a claimant does not have any impairment or

combination of impairments which significantly limit his or her physical or mental ability to do

basic work activities, then he or she does not have a severe impairment and is not disabled.  20

C.F.R. § 404.1520 (c).  Third, if a claimant's impairments meet or equal an impairment listed in 20

C.F.R. Part 404, Subpart P, Appendix 1, he or she is disabled.  20 C.F.R. § 404.1520 (d).  Fourth,

if a claimant's impairments do not prevent him or her from doing past relevant work, he or she is

not disabled.  20 C.F.R. § 404.1520 (e).  Fifth, if a claimant's impairments (considering his or her

residual functional capacity, age, education, and past work) prevent him or her from doing other

work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520 (f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423 (d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545 (b).

-12-

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills."  *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.  *Foote*, 67 F.3d at 1559.

**D.      TREATING PHYSICIANS**

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11ᵗʰ Cir. 1986); Lewis *v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11ᵗʰ Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and

-15-

the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the

medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.)

specialization in the medical issues at issue; 6.) other factors which tend to support or contradict

the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally

entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d

513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

    The ALJ is required to review all of the medical findings and other evidence that support a

medical source's statement that a claimant is disabled.  However, the ALJ is responsible for

making the ultimate determination about whether a claimant meets the statutory definition of

disability.  20 C.F.R. § 404.1527 (e).  The ALJ is not required to give any special significance to

the status of a physician as treating or non-treating in weighing an opinion on whether the claimant

meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545

and 404.1546), or the application of vocational factors because those ultimate determinations are

for the Commissioner.  20 C.F.R. § 404.1527 (e).

    The ALJ must, however, state with particularity the weight given different medical

opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*,

825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is

impossible for a reviewing court to determine whether the ultimate decision is supported by

substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress

has determined that a claimant will not be considered disabled unless he furnishes medical and

other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical

impairment which could reasonably be expected to produce the pain or symptoms alleged.  42

U.S.C. § 423 (d)(5)(A).  The ALJ must consider all of a claimant's statements about his

symptoms, including pain, and determine the extent to which the symptoms can reasonably be

accepted as consistent with the objective medical evidence.   20 C.F.R. § 404.1529.  In

determining whether the medical signs and laboratory findings show medical impairments which

reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh

Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and
> either (2) objective medical evidence that confirms the severity of the alleged pain
> arising from that condition or (3) that the objectively determined medical condition
> is of such a severity that it can be reasonably expected to give rise to the alleged
> pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain

alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v.*

*Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not,

by itself, conclusive of disability.  42 U.S.C. § 423 (d)(5)(A).

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must

articulate specific and adequate reasons for doing so, or the record must be obvious as to the

-17-

credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.      MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required

-18-

to order a consultative examination unless the record establishes that such an examination is

necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206,

1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order

such an evaluation may be reversible error).  Under the regulations, however, the ALJ may

determine that a consultative examination or other medical tests are necessary.  20 C.F.R. §

416.917 (1998).

      **H.     THE EVALUATION OF MENTAL DISORDERS**

      The evaluation of disability on the basis of mental disorders requires the documentation of

a medically determinable impairment, as well as consideration of the degree of limitation such

impairment may impose on the individual's ability to work.  The listings for mental disorders are

arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in

paragraphs B and C of the listings for mental disorders describe those functional limitations

associated with mental disorders which are incompatible with the ability to work — i.e.

limitations in functional areas deemed essential to work.  A mental impairment is medically

equivalent to a listed mental impairment if the medical findings are at least equal in severity and

duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the

criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404,

Subpt. P, App. 1.

      Individuals who have an impairment with a level of severity which does not meet the

criteria of the listings for mental disorders may or may not have the residual functional capacity

["RFC"] which would enable them to engage in substantial gainful work activity.  The

-19-

determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in

substantial gainful work activity when the criteria of the listings for mental disorders are not met

or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by

the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings

for mental disorders (activities of daily living; social functioning;  concentration, persistence, or

pace;  and ability to tolerate increased mental demands associated with competitive work).  A

"marked" degree of limitation means more than moderate, but less than extreme.  A marked

limitation may arise when several activities or functions are impaired or even when only one is

impaired, so long as the degree of limitation is such as to seriously interfere with the ability to

function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The

Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all

evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The

technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§

404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports

from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals

and clinics.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical

sources may be used to obtain detailed descriptions of the individual's activities of daily living;

social functioning;  concentration, persistence and pace;  or ability to tolerate increased mental

demands (stress).  This information can be provided by programs such as community mental

health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive

-21-

therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic

disorders commonly have their lives structured in such a way as to minimize stress and reduce

their signs and symptoms.  Such individuals may be much more impaired for work than their signs

and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single

examination may not adequately describe these individuals' sustained ability to function.  It is,

therefore, vital to review all pertinent information relative to the individual's condition, especially

at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to

obtain adequate descriptive information from all sources which have treated the individual either

currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms

and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may

control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment

may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt.

404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic

medications, particular attention must be focused on the functional restrictions which may persist.

These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R.

Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to

temporary remission.  In assessing whether medical improvement has occurred in persons with this

type of impairment, the ALJ will consider the longitudinal history of the impairments, including

the occurrence of prior remission, and prospects for future worsening.  Improvement in such

-22-

impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R.

§ 404.1594 (iv).

## V.      APPLICATION AND ANALYSIS

### A.      THE FACTS

#### 1.      Evidence Before the ALJ

Williams was admitted to Florida Department of Corrections, North Florida Reception

Center Hospital on February 16, 1999.  R. 140-143.  The admission diagnosis was to rule out

cerebral vascular accident ["CVA"]; hypertension; and HIV infection. R. 140.  His symptoms were

a severe frontal headache followed by dizziness with subsequent loss of consciousness after he

fell.  R. 140.  He was initially evaluated and diagnosed with Bell's Palsy based on a normal CT

scan of the head that did not show any bleeding or mass effect.  At the time of admission,

Williams denied headache and dizziness, but did complain of difficulty speaking and weakness on

the right side of his face as well as in the right upper extremity. R. 140.  Williams was a "very poor

historian." R. 140.  The pertinent physical findings showed that Williams had dysarthria,[3] right

hemifacial asymmetry, impaired cranial nerves V, VII, X, AND XII on the right side of the face.

Strength was decreased in the right upper and lower extremities with a 3/5 proximal and distal

extremities.  His grip was stronger in the left than in the right hand.  Deep tendon reflex were 4+

and symmetric. Williams had an impaired finger, nose, finger sign bilaterally.  R. 141.

---

[3]A disturbance of speech due to emotional stress, brain injury, paralysis, incoordination or spacticity of the muscles used for speaking. STEDMAN'S MEDICAL DICTIONARY 550 (27th ed., 2000).

Williams was given medication to improve perfusion to the brain and to avoid further cerebral vascular damage. R. 141.  A follow up CT scan showed no progression of the infarct in the left parietal lobe.  R. 141.  Due to confidentiality concerns, Williams refused to start antiretroviral therapy in prison. R. 142.  MRI of the brain with and without contrast dated February 25, 1999 showed acute left parietal infarction and also an old infarct in the right cerebellar hemisphere.  R. 142.  Williams was discharged from the prison hospital on March 1, 1999 with a diagnosis of hypertension, status post left parietal ischemic infarct, HIV infection, and history of syphilis.  R. 143.

Medical records from Arnold Palmer Hospital[4] ranging from November 20, 2001 to September 2, 2003 reveal that Williams reported depression without being suicidal (R. 167); fatigue for three years, right side pain intermittently for two years lasting up to twenty minutes which is aggravated by positional change, radiating pain and tingling (R. 165); cachexia (R. 166); low back pain (R. 162); wasting (R. 163); arthritis and low back pain (R. 160); migraine controlled with medication (R. 158); bad headaches (R. 155); headache, cepholgia stress and headaches relieved with rest (R. 153-154); headache (R. 151-152); chest pain, gallop noted, tachycardia at present, hypertension not under control (R. 149-150); chest discomfort, hypertension, history of cerebrovascular accident and smoking (R. 147-148); sharp migraine (R. 144-145); low back pain

---

[4]The Hug-Me Program is affiliated with Arnold Palmer Hospital.

-24-

(R. 255); and clinician observed pain with ambulation, limited range of motion, positive SLR pain, bulging noted, HIV, lower back pain, migraine headache and hypertension (R. 252).[5]

On January 16, 2002, Williams received a consultative examination from Sam Ranganathan, M.D., a Diplomate of the American Board of Internal Medicine. R. 199-200. Dr. Ranganathan reported that Williams had received disability from 1996 to 1998, and stop receiving benefits after being sent to prison. *Id*. Williams reported that he had suffered a "stroke twice involving the right side of the body[;]" that he is dominant in his right hand; that he has numbness in the hands all the time, and a tingling or dead sensation in the right upper extremity more than the left upper extremity. *Id*. Williams also reported that he could walk three to four blocks, sit for 20 minutes, and stand for 20 minutes. *Id*. Williams reported that he has had low back pain on and off starting in 1984; that he re-injured himself in 1994; that the pain radiates into the legs at times; and that he was able to bend to a certain extent. *Id*.

In his Review of Systems section, Dr. Ranganathan reported that Williams suffered from HEENT headache all the time at the top of his head; that he gets chest tightness at times not related to exertion with no other associated symptoms; that he gets short of breath if he does too much; that he has smoker's cough; that he has CNS paresthesia in the feet at times; and that he has a psychiatric history of depression. *Id*. In his "On Examination" section, Dr. Ranganathan stated that Williams had CNS hand grip of 5/5 and equal bilaterally; motor system strength right 4 to 5/5 in the upper extremity; lower extremity 5/5 bilaterally; sensory system decreased sensation to

---

[5]According to a medical record from Arnold Palmer Hospital considered by the Appeals Council, Williams reported migraines on September 2, 2003.  R. 291.

touch in the right upper extremity; able to walk without any assistive devices; tandem walk somewhat hard; able to walk on heels and toes; right facial weakness; MSK SLR negative in both legs in lying down position; and no LS spine spasm or tenderness noted.  *Id*.

Dr. Ranganathan's "Impression" section noted a history of positive HIV status; lumbosacral spine sprain and possible DJD; history of syphilis, treated; left CVA with right-sided weakness perhaps related to fibrinoid necrosis due to HTN.  *Id*.  Dr. Ranganathan's "Functional Capacity" section reported that Williams could stand and/or walk about 6 hours; sit for 6 hours; lift and carry 20 pounds occasionally and 10 pounds frequently; frequent postural and occasional environmental workplace limitations like heights and driving because of lumbosacral sprain; and that there were no manipulative limitations.  *Id*.

On January 21, 2002, Rosimeri Pereira Clements, Psy.D., Clinical Psychologist, performed a consultative examination on Williams.  R. 201-204.  Dr. Clements noted that Williams suffered a cerebral stroke in 1999; that a CT-scan found the 1999 stroke was a second stroke for Williams; and that the CT-scan revealed right brain damage from the first stroke and left brain damage from the second stroke.  R. 201.  Williams reported that, since his stroke, he had throbbing headaches, fatigue, and shortness of breath.  *Id*.  In addition, Williams reported that he is easily distracted and suffered from short-term memory loss.  *Id*.  Williams also reported numbness in the hands and feet; that he injured his back at work in 1984, has suffered from arthritis in the right lower back and right hip, and that he re-injured his back in prison.  *Id*.  Williams further reported that he was diagnosed HIV, sexually contracted, in 1983.  *Id*.  Williams reported that he was last able to work in 1984 because of his poor health, and that he made no attempts to return to work.  *Id*.

Dr. Clements reported Williams's functional ability as poor. *Id*. Dr. Clements' Past History section states that Williams was enrolled in remedial reading and writing classes in the seventh and eighth grades. *Id*. According to the Past History section, Williams was treated for drug abuse while in prison; served time from 1988 - 1992 on cocaine charges, from 1993 - 1995 for burglary, and from 1998 - 2001 for cocaine charges. R. 202. According to Dr. Clements' "General Observations" section, Williams reported that his driver's license was suspended, and that he could get it back, but has not had time. *Id*. Williams reported that he had trouble sitting or standing for more than 20 minutes at a time. *Id*.

Dr. Clements observed no prominent gain abnormalities or gross motor coordination problems and no fine motor shakes or tremors. *Id*. Dr. Clements observed Williams to be alert and well oriented, with no symptoms of psychosis; no suicidal ideation; good recall of recent and remote events suggesting no short-term or long-term memory impairment; speech and thought processes logical and coherent; no articulation problems; a full range of appropriate affects and no acute mental distress. *Id*. The doctor noted that Williams does not use illicit drugs, and that finding a place to live was the major stressor. R. 202-03. It was noted that Williams was cooperative and appeared to put forth his best effort on the abbreviated neuropsychological screening, and that the test was valid. R. 203. The Wechsler Memory Scale revealed no indication of gross memory impairment; an auditory immediate score within the average range; a visual immediate score within the average range; and an immediate working-memory score at the high end of the low average range. *Id*.

Dr. Clements' prognosis for Williams was guarded.  Dr. Clements opined that Williams

was not gainfully employable at this time because of chronic medical problems.  *Id*.  Dr. Clements

diagnosed Axis I (293.83[6]) Mood Disorder Due to HIV With Depressed Features and (305.60)

Cocaine Abuse; Axis II (799.9) Deferred; Axis III HIV, history of syphilis, multiple parietal

ischemic infarct, lower back and right hip arthritis, controlled hypertension and cholesterol; Axis

IV temporary housing, health issues, legal history; and Axis V Present GAF = 55.[7]  R. 203-04.

On January 29, 2002 and August 8, 2002, Physical Residual Functional Capacity

Assessment were completed by non-examining physicians.  R. 205-12 and 241-48.  Both non-

examining physicians noted that Williams could lift and/or carry occasionally 20 pounds and

frequently 10 pounds; could in an 8-hour workday, with normal breaks, stand and/or walk about 6

hours and sit about 6 hours; and found no limits with pushing and/or pulling.  R. 206 and 242.

Both non-examining physicians found no postural limitations were established.  R. 207 and 243.

In addition, both non-examining physicians found no manipulative, visual or communicative

limitations were established.  R. 208-09 and 244-45.  However, only the first non-examining

physician noted that Williams should avoid concentrated exposure to hazards such as machinery

and heights due to history of CVA.  R. 209.  The same non-examining physician also attributed

---

[6]The diagnosis codes are from the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"].  The DSM-IV contains the diagnostic criteria for mental disorders.

[7]The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations.  DSM-IV at 32.  A GAF code of 51 - 60 indicates moderate symptoms, or moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers).  DSM-IV at 32.

Williams' symptoms  to Right Upper Extremity weakness, CVA, and HIV+ status with opportunistic infection.  R. 210.

On February 14, 2002, a Psychiatric Review Technique form was completed by a non-examining licensed psychologist.  R. 213-26.  The psychologist found no severe impairment based on affective disorders.  R. 213.  The affective disorder that was present was a mood disorder due to HIV with depressive features.  R. 216.  A substance addiction disorder was noted as cocaine abuse, however, Williams reported no current illicit drug abuse.  R. 221.  The functional limitations of restriction of activities of daily living, difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace were all noted to have a mild degree of limitation.  R. 223.  In summary, the non-examining psychologist found that Williams's had a mood disorder that was secondary to his medical condition, but not severe, and that Williams "appears capable of some sustained routine task activity in a setting that does not require him to have frequent contact with the public." R. 226 - 27.

2.      **Evidence Before the Appeals Council**

The following medical evidence was considered by the Appeals Council only:  (1) Initial Medical Evaluation dated April 27, 2004 from Francis W. Brooks, D.O., a pain management doctor, of the Physical Medicine Pain Center, P.A., (2) MRI of the Cervical Spine dated April 27, 2004 from Marc A. Engel, M.D., a Radiologist and Neurologist, of Stand-Up MRI of Orlando, and (3) MRI of the Lumbar Spine dated April 16, 2004 from Mark J. Timken, M.D., a Radiologist, of Mid Florida Imaging.  R. 8, 311-22.

The MRI of the lumbar spine revealed a disc bulging at L3-4 with right posterolateral

-29-

herniated nucleus pulposus producing stenosis to the right neural foramen.  R. 320-21.  The L4-5 revealed a posterocentral herniated nucleus pulposus effacing the ventral epidural fat and in combination with facet arthropathy producing bilateral neural foramen stenosis. R. 320-21.  At L5-S1, there was disc bulging and spondylosis effacing ventral neural epidural fat in combination with facet arthropathy producing bilateral neural forament stenosis.  R.320-21.

Dr. Brooks found discogenic spondylosis of the L-3, L-4 and L-5 levels and some sclerotic changes of the posterior facet joints throughout the lumbar spine.  R. 312.   The MRI of the cervical spine revealed advanced degenerative disc disease and spondylosis from C3-4 through C6-7 and canal stenosis at C4-5.  R. 319.  Dr. Brooks' head examination of Williams revealed segmental pain originating from the upper cervical segments, C1 and C2, that was present with somatic dysfunctions of the occiput and atlas.  The pain started at the center of the neck and spread to occiput and the vertex.  R. 313.  In addition, his neck examination of Williams revealed trigger point tenderness in the occipital region, and deeper palpation produced sharp pain in the area of the suboccipital nerve.  R. 314.  There was cervicothoracic rigidity with decreased range of motion.  *Id*. Dr. Brooks found that the Williams's cervical Flexion was 30, extension 25, right lateral flexion 20, left lateral flexion 25, rotation to the right 65 and rotation to the left 70.  R. 314.

Dr. Brooks found in Williams's right upper extremities that his deltoid, triceps and grip was 4/5.  R. 314.  Dr. Brooks' thorax examination revealed myofascial rigidity bilaterally upon palpatory examination of the thoracodorsal spine, and that somatic dysfunctions were present from T1 to T7 bilaterally with tenderness upon palpation of the vertebral dorsal rib articulation.  R. 314.

Abdomen examination by Dr. Brooks revealed bilateral orchitits and examination of the testicles

showed tenderness in the epididymal area.  R. 315.

Dr. Brooks' back examination revealed pain during active and passive range of motion

testing and sciatic radiation into the lower extremity.  R. 315.  Plaintiff's pain originated in the

lower lumbar area and down the legs to the ankles.  *Id*.  Dr. Brooks also noted that pain was also

present in the sacroiliac region, and was aggravated by prolonged postures such as standing and

ambulating.  R. 315.  Dr. Brooks' examination of Williams's lower extremities revealed a half inch

discrepancy with the ipsilateral anterior iliac spine displaced cephalad as is the contralateral

posterior super iliac spine, and that there was a left sacroiliac joint somatic dysfunction.  R. 315.

Motor examination showed 4/5 in hip flexor, quadriceps, hamstrings, anterior tibialis, extensor

hallucis and gastroc soleus.  R. 315.

Sensory examination revealed decreased pin prick sensation at L1-S1 on the right, S1 on the

left and C7 bilaterally.  R. 315.  The assessment was posttraumatic occipital neuralgia, traumatic

cervical neuritis and myofasciitis, thoracic strain with costovertebral somatic dysfunctions, bilateral

upper extremity radiculitis, traumatic lumbar myosotiss, lumbar disc syndrome, bilateral S-1

radiculitis, right L-5 radiculitis and bilateral sacroiliitus.  R. 316.

**B.     THE ANALYSIS**

**1.     Examining Physicians**

First, Williams argues that the Commissioner erred in not giving substantial weight to the

testimony of his examining physicians.  Absent "good cause" to the contrary, the ALJ must give

substantial weight to the opinion, diagnosis and medical evidence of Williams's treating

-31-

physicians.  If a treating physician's opinion on the nature and severity of Williams's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.

Williams argues that the ALJ should have given substantial weight to the opinions of two consulting physicians, Dr. Ranganathan and Dr. Clements.  Docket No. 14 at 5 - 6.  The Commissioner is correct that these two doctors are not treating physicians.  Each doctor saw Williams once as a consultant.  Docket No. 15 at  4-5.  The ALJ therefore did not err in failing to give substantial weight to the consultative examinations performed by Dr. Ranganathan and Dr. Clements.

Neither the ALJ nor the Appeals Council, however, addressed Williams's actual treating source — the Arnold Palmer Hospital.  *See* R. 250 - 68 (Arnold Palmer Hospital records before ALJ) and  R. 144 - 98; 288 - 309 (Arnold Palmer Hospital records before AC).  The Commissioner must state with particularity the weight given different medical opinions and the reasons.  Indeed, the failure to do so is reversible error.  Otherwise, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  Nevertheless, the Court need not address this argument because Williams never raises it.

### 2.      Severity of Mental Impairment

Next, Williams argues that the Commissioner erred by finding Williams's mental impairment not to be severe.  The evaluation of Williams's mental disorder requires not only the documentation of a medically determinable mental impairment, which has occurred here, but also

-32-

the consideration of the degree of limitation such impairment may impose on Williams's ability to

work.  Williams correctly argues that the consultative examiner, Dr. Clements, found Williams's

GAF to be 55, and correctly defines a GAF of 55 in DSM-IV as "moderate symptoms (e.g. flat

affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social,

occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  Docket

No. 14 at 7.  However, Williams fails to present any specific symptoms that arise from his mental

condition.  He merely concludes that a current GAF of 55 alone — on a single day  — warrants "a

finding from the ALJ that [the] Plaintiff suffered from a severe mental impairment."  Docket No.

14 at 8.  Williams has not shown any error by the ALJ in finding Williams's mental impairment to

not be severe.

     **3.**      **Proof That Williams Can Do Alternative Work Despite Non-Exertional
Impairments**

     Lastly, Williams argues that the Commissioner failed to prove that he could perform

alternative work that exists in the national economy through the testimony of a vocational expert.

In doing so, Williams argues that the Commissioner erred in discounting his subjective complaints

of pain.

     In this case, the ALJ properly found that Williams could not return to his prior work as a

dishwasher.  R. 19, Finding 7.  The burden of proof then shifted to the Commissioner to establish

that Williams could perform other work that exists in the national economy.  In determining

whether the Commissioner has met her burden, the law requires the ALJ to develop a full record

regarding the vocational opportunities available to Williams.  In meeting this burden, exclusive

reliance on the "grids" would have been appropriate only if Williams had suffered primarily from an exertional impairment, without significant non-exertional factors.

Exclusive reliance would not have been appropriate if Williams were unable to perform a full range of work at the appropriate residual functional level, or if Williams had a non-exertional impairment that significantly limited his basic work skills.  It is only if Williams could clearly do unlimited types of work at the appropriate residual functional level that it is unnecessary to call a vocational expert to establish whether Williams could perform work which exists in the national economy.  In any event, the law required the ALJ to make a specific finding as to whether Williams's non-exertional limitations were severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

Williams claims to have the following non-exertional limitations that require a vocational expert's assessment:  postural limitations; environmental limitations; pain; and mental limitations. Docket No. 14 at 8.  Specifically, Williams alleges that he cannot have a concentrated exposure to hazards; has frequent postural limitations; and has occasional environmental limitations, such as heights.  Docket No. 14 at 9.  Williams further alleges that he has consistently complained to doctors of pain  —  constant headaches due to two CVAs; severe daily migraines; chest pain; and severe back and neck problems that radiated into his hips.  Docket No. 14 at 10.  In addition, Williams argues that he suffers from a mental impairment that renders the use of the grids inappropriate.  Docket No. 14 at 10.  However, this Court has already determined that the ALJ did not err in not finding that Williams's mental impairment was not severe.

-34-

### a.      Record Before the ALJ

An ALJ must articulate specific and adequate reasons for discrediting subjective pain testimony, or the record must be obvious as to the credibility finding.  A failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.[8]

Credibility is critical here.  In determining that Williams could do the full range of light work, the ALJ decided not to credit Williams's testimony about his pain.  Rather, the ALJ found Williams's pain allegations "not credible" and "not totally credible."  R. 16, 19, Finding 4.  The ALJ properly found Williams's exaggerated claim of illiteracy not credible.  Furthermore, Williams admits that he is a former cocaine abuser who has been convicted of narcotics and burglary offenses.  Nevertheless, the ALJ must properly evaluate Williams's allegations of pain under the standard in *Foote*.

The ALJ considered whether Williams had underlying medical conditions that tend to confirm the severity of the pain and limitations alleged, and whether these conditions provide a basis for Williams's pain, discomfort, and limitations.  Williams suffered from a CVA; status post left parietal ischemic infarct; and lumbar spine sprain.  The ALJ rejected Williams's allegations of low back pain, however, relying solely on Dr. Ranganathan's January 2002 consultative examination:

---

[8]Social Security Ruling 96-7p provides that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."

-35-

> There is no documented objective evidence to substantiate the degree of pain and symptoms alleged. The evidence does not show any impairment that could be expected to give rise to the severely limiting and disabling symptoms alleged by the claimant.
>
> The claimant has stated that he is disabled due to low back pain. When he was examined by Dr. Ranganthan in January 2002, his overall examination was within normal limits. His hand grip was 5/5 and equal bilaterally and he had no lumbar spine spasm or tenderness. He had negative bilateral straight leg raising (SLR). His gait was normal and he was able to walk without any assistance devices. Dr. Ranganathan assessed the claimant as having no difficulties walking, standing or sitting, as well as having no manipulative limitations[.]

R.16.

Although not noted by the ALJ, Dr. Ranganathan also found that Williams had a lumbosacral spine sprain and possible DJD, and left CVA with right-sided weakness perhaps related to fibrinoid necrosis due to HTN. R. 200. Dr. Ranganathan observed tandem walk to be "somewhat hard" for Williams. Dr. Ranganathan also found and motor system strength of 4 to 5/5 in Williams's upper right extremity; right facial weakness; and decreased sensation to touch. *Id.*

With regard to Williams's allegations of frequent headaches, residuals from his stroke, hypertension, shortness of breath and fatigue, the ALJ found that Williams presently smokes a half pack of cigarettes per day; that he inhaled cocaine since 1991; that had a normal EKG; that he is HIV positive without anti-retroviral therapy; that his hypertension is medically controlled; and that his lungs are clear. R. 16. The ALJ did not otherwise address Williams's allegations of frequent headache, hypertension, shortness of breath and fatigue. Williams reported to Dr. Clements that he received drug abuse treatment while he was in prison and that he no longer used illicit drugs. R. 202; see also 336. Also, the medical records from Williams' treating source, Arnold Palmer Hospital, revealed that Williams reported bad headaches (R. 155); headache, cepholgia stress and

-36-

headaches relieved with rest (R. 153-154); headache (R. 151-152); chest pain, gallop noted, tachycardia at present, hypertension not under control (R. 149-150); chest discomfort and hypertension (R. 147-148); sharp migraine (R. 144-145); and migraine headache and hypertension (R. 252).

The ALJ assumed that Williams would not experience more than a "mild level of pain that would impose no more than mild limitations on his ability to function" if he would simply "follow his prescribed medications, refrain from smoking, and refrain from substance abuse." R. 17. The ALJ cited no medical finding that supports his assumption. For the reasons given below, however, this Court need not determine whether the ALJ erred in finding Williams not disabled. After considering an expanded record, the Appeals Council erred in finding no basis for changing the ALJ's decision. R. 5 - 6.

### b.  Record Before the Appeals Council

The Appeals Council considered evidence[9] that supports Williams's claim of pain and postural limitations during the relevant time period. The MRI of the lumbar spine on April 16, 2004 (two months after the ALJ's decision), revealed a disc bulging at L3-4 with right posterolateral herniated nucleus pulposus producing stenosis to the right neural foramen. R. 320-21. The L4-5 revealed a posterocentral herniated nucleus pulposus effacing the ventral epidural fat and in combination with facet arthropathy producing bilateral neural foramen stenosis. R. 320-21.

---

[9]Specifically relevant are the Initial Medical Evaluation dated April 27, 2004 from Francis W. Brooks, D.O. the MRI of the Cervical Spine dated April 27, 2004 from Marc A. Engel, M.D., and the MRI of the Lumbar Spine dated April 16, 2004 from Mark J. Timken, M.D.  R. 8, 311-22.

At L5-S1, there was disc bulging and spondylosis effacing ventral neural epidural fat in combination with facet arthropathy producing bilateral neural forament stenosis.  R.320-21.

Dr. Brooks, an osteopath Board Certified by the American Academy of Pain Management, found discogenic spondylosis of the L-3, L-4 and L-5 levels and some sclerotic changes of the posterior facet joints throughout the lumbar spine.  R. 312 (examination on April 27, 2004, two months after the ALJ's decision).   The MRI of the cervical spine revealed advanced degenerative disc disease and spondylosis from C3-4 through C6-7 and canal stenosis at C4-5.  R. 319.  Dr. Brooks' examination of Williams's head revealed segmental pain originating from the upper cervical segments, C1 and C2, that was present with somatic dysfunctions of the occiput and atlas. The pain started at the center of the neck and spread to occiput and the vertex.  R. 313.  In addition, his neck examination of Williams revealed trigger point tenderness in the occipital region, and deeper palpation produced sharp pain in the area of the suboccipital nerve.  R. 314.  There was cervicothoracic rigidity with decreased range of motion.  *Id.*  Dr. Brooks found that the Williams's cervical Flexion was 30, extension 25, right lateral flexion 20, left lateral flexion 25, rotation to the right 65 and rotation to the left 70.  R. 314.

In Williams's right upper extremities, Dr. Brooks found that his deltoid, triceps and grip was 4/5.  R. 314.  Dr. Brooks' thorax examination revealed myofascial rigidity bilaterally upon palpatory examination of the thoracodorsal spine, and that somatic dysfunctions were present from T1 to T7 bilaterally with tenderness upon palpation of the vertebral dorsal rib articulation.  R. 314. Abdomen examination by Dr. Brooks revealed bilateral orchitits and examination of the testicles showed tenderness in the epididymal area.  R. 315.

-38-

Dr. Brooks' back examination revealed pain during active and passive range of motion testing and sciatic radiation into the lower extremity. R. 315. Plaintiff's pain originated in the lower lumbar area and down the legs to the ankles. *Id*. Dr. Brooks also noted that pain was also present in the sacroiliac region, and was aggravated by prolonged postures such as standing and ambulating. R. 315. Dr. Brooks' examination of Williams's lower extremities revealed a half inch discrepancy with the ipsilateral anterior iliac spine displaced cephalad as is the contralateral posterior super iliac spine, and that there was a left sacroiliac joint somatic dysfunction. R. 315. Motor examination showed 4/5 in hip flexor, quadriceps, hamstrings, anterior tibialis, extensor hallucis and gastroc soleus. R. 315.

Sensory examination revealed decreased pin prick sensation at L1-S1 on the right, S1 on the left and C7 bilaterally. R. 315. The assessment was posttraumatic occipital neuralgia, traumatic cervical neuritis and myofasciitis, thoracic strain with costovertebral somatic dysfunctions, bilateral upper extremity radiculitis, traumatic lumbar myosotis$_s$, lumbar disc syndrome, bilateral S-1 radiculitis, right L-5 radiculitis and bilateral sacroiliitus. R. 316.

In light of the evidence considered by the ALJ and the Appeals Council, it is not clear that Williams lacks credibility as to the severity of his pain and his non-exertional limitations. Moreover, it is far from evident on the record before the Appeals Council that Williams can ***clearly*** do unlimited types of light work. The Commissioner should have remanded this case for the ALJ to describe the extent of any non-exertional limitations, and to elicit vocational expert testimony as to whether Williams can perform work which exists in the national economy in light of those limitations.

## VI.   **CONCLUSION**

The Appeals Council considered significant objective evidence corroborating Williams's

allegations of pain.  Specifically, the Appeals Council considered evidence of advanced

degenerative disc disease of the cervical spine with spondylosis from C3-4 through C6-7 and

discogenic spondylosis of the L-3, L-4 and L-5 levels with some sclerotic changes of the posterior

facet joints throughout the lumbar spine.  R. 319, 312.   These conditions existed during the period

under consideration by the ALJ.  Williams has significant non-exertional impairments that require

the testimony of a vocational expert to determine whether work, other than work as a dishwasher,

exists in the national economy which he can perform.  Accordingly, the Appeals Council erred in

not remanding the case 1.) for a re-evaluation of Williams's pain testimony; 2.) for a re-evaluation

of Williams's credibility as to the extent of his pain and limitations; and 3.) for the presentation of

hypothetical questions to a vocational expert.

For the reasons stated above, the decision of the Commissioner should be **REMANDED** to

the Commissioner of Social Security under 42 U.S.C. § 405 (g), Sentence Four, for further

proceedings not inconsistent with this opinion.  The district court should then direct the Clerk to

enter a judgment and close the case.

Failure to file written objections to the proposed findings and recommendations in this

report pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within ten days of the date of its

filing shall bar an aggrieved party from a *de novo* determination by the district court of issues

covered in the report, and shall bar an aggrieved party from attacking the factual findings on

appeal.

**DONE AND ORDERED** this 20th day of October, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record, and to:

The Honorable Gregory A. Presnell

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia  30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL  33602

The Honorable Chester G. Senf
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL  32817